## Case No. 12,283.

### The SAM SLICK.

[1 Spr. 289;[1] 18 Law Rep. 162.]

District Court, D. Massachusetts. May, 1855.[2]

MARITIME LIENS—UNDER STATE STATUTE—WHEN TITLE TO VESSEL PASSES—WAIVER OF LIEN.

1. Where a new vessel sailed from Newburyport for Boston, and was very soon, by stress of weather and want of provisions, driven into the harbor of Portsmouth, and on the day following, left for Boston: *Held*, that the lien given by the Massachusetts statute of 1848, c. 290, was not lost.

2. A vessel in process of construction, under a contract between a merchant and the builder, does not usually, at least as against third persons, become the property of the merchant, upon his making the first payment.

3. A charge for materials being made against the builder alone, without naming the vessel, does not constitute a waiver of the lien. Nor is it conclusive evidence of an intention to rely exclusively upon the personal responsibility of the builder.

There were two libels in admiralty, against the barque Sam Slick, for materials used in the construction of that vessel, and furnished by the libellants to the builders, Manson & Fernald. The libels were founded upon

---

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

[2] [Reversed in Case No. 12,282.]

the statute of Massachusetts of 1848. c. 290, which is as follows:

"Section 1. Whenever a debt is contracted for labor performed, or materials used, in the construction or repair of, or for provisions and stores or other articles furnished for, or on account of, any ship or vessel within this commonwealth, such debt shall be a lien upon such ship or vessel, her tackle, apparel, and furniture, and shall be preferred to all other liens thereon, except mariners' wages.

"Sec. 2. When the ship or vessel shall depart from the port at which she was when such debt was contracted to some other port within this commonwealth, every such debt shall cease to be a lien at the expiration of twenty days after the day of such departure; and in all cases such lien shall cease, immediately after the vessel shall have arrived in any port out of this commonwealth; provided, however, that nothing in this act shall alter, or be construed to alter, or in any way affect, the lien as now existing on foreign ships and vessels."

It appeared, by the agreed statement of facts, that the materials in question, were used in the construction of the barque Sam Slick, in the port of Newburyport; that they were furnished by the libellants, to Manson & Fernald, the builders, and charged to them on their books, the libellants knowing that they were to go into that vessel, and supposing that they had a lien on it for them; and that with the exception of a partial payment on one of the accounts, they were still unpaid for. It also appeared, that the barque was built under a contract between Manson & Fernald and the present owner, the claimant in this suit, Captain Mayo, which contract was in writing, and specified particularly the manner of her construction, and also provided that, at a certain stage of the work, a payment of $5,000 was to be made by Captain Mayo, on the builders' furnishing satisfactory security. It also appeared that Captain Mayo paid Manson & Fernald, according to the contract; but the libellants did not know, at the time of furnishing the materials, that there was such a contract. The vessel was completed on or about May 19th, 1854, and sailed from Newburyport for Boston on the 20th, it being the intention of the master to proceed directly to Boston; but soon after leaving Newburyport, and on the same day, in consequence of head winds. and approaching dense fog, and being short of provisions, the barque was obliged to put back for a harbor and provisions; and the port of Newburyport not being of easy access for so large a vessel, the harbor of Portsmouth, in the state of New Hampshire, was deemed the most suitable place to go into, and she put into (and anchored in) the harbor of Portsmouth, the same day; and on the next day, afer taking on board a sufficient supply of provisions, she sailed for the port of Boston, where she arrived on the following day, and there remained, until she was libelled in these suits, on the 23d of the same month. The counsel for the claimant contended that the libellants had no lien upon the vessel, because: 1st. She had arrived at a port out of this commonwealth, before she was libelled. 2d. She was built under a contract with Manson & Fernald, who would have a lien for their pay, and the libellants, being sub-contractors, could not also have a lien, thus subjecting the owner to a double lien; and on this point, he cited Smith v. The Eastern Railroad [Case No. 13,039]. 3d. The libellants charged those materials to Manson & Fernald, instead of the barque and owners, which charge, the counsel contended, was a waiver of the lien. He also claimed, under the second point, that Captain Mayo became the owner of the vessel, and that the property therein passed to him, upon his making the first payment toward her; and to maintain this, he cited Woods v. Russell. 5 Barn. & Adol. 942; and Clarke v. Spence, 4 Adol. & E. 448.

P. W. Chandler and William Rogers, for libellants.

Charles Mayo, for claimant.

SPRAGUE, District Judge, said that the first objection raised by the counsel for the claimant, appeared a formidable one. Liens of this kind did not exist before the passage of the statute, and the libellants must bring themselves within its meaning. The vessel entered the harbor of Portsmouth, before she was libelled. The question is, whether she is to be considered as having arrived at a port out of this commonwealth, within the meaning of the statute. The counsel for the libellants had cited the case of Hancox v. Dunning, 6 Hill, 494, in which it was held by the court, in an opinion delivered by Bronson, J., that after a lien had been acquired, pursuant to the New York statute, it was not lost, although the vessel made a short excursion, beyond the bounds of the state, for the mere purpose of testing her machinery, in the course of which she landed, and made fast to the dock at Perth Amboy, in New Jersey, remained there about two hours, and immediately returned to her former berth in the city of New York. The New York statute is not in precisely the same words with ours, the language being, "such lien shall cease immediately after the vessel shall have left the state;" but the decision is in point. In that case, the court held that the excursion. though within the letter, did not come within the meaning, scope and purpose of the statute. In the present case, the libellants had no reason to expect that the lien would be lost, by the vessel's starting from Newburyport. Neither party could have anticipated her being driven into Portsmouth. Such an entry into that harbor cannot be considered an arrival, within the meaning of the legislature. The policy upon which the law may be supposed to have been

founded, would not be promoted by so rigid a construction. On the strength of the decision in New York, and a view of the purposes of the Massachusetts statute, and the circumstances of this case, the court do not think that the lien was lost by the vessel's being driven into Portsmouth.

The second objection is, that the claimant became the owner of the vessel, upon making the first payment, and that the builders had a lien upon her, and that the libellants, being sub-contractors, could not also have a lien.

This objection cannot prevail. There is nothing in the contract which indicates an intention that this vessel should become the property of the claimant, before she should have been completed and delivered to him.

By the terms of the contract, $5,000 were to be paid, at a certain stage of the work, to the builders, upon their furnishing security. This indicates that the vessel was not to be held by Mayo, the claimant, as his own, or even as security. The contract also provides for a delivery of the vessel by the builders to Mayo, after her completion.

It is not true, as contended, that a vessel in the process of construction, under a contract between a merchant and the builder, becomes as against third persons, the property of the merchant upon his making the first payment. The English decisions cited, use the guarded language, "as between the parties themselves." These libellants had no notice of any contract, or of any ownership by any one. except that of the builders. She was built by Manson & Fernald, at their own ship-yard, in their own name, and to all the world they appeared to be the owners. And so far at least as the rights of the libellants are concerned, they must be deemed to have been so. And the lien of the libellants would not. therefore. subject her to a double lien. This case differs materially from that cited from Curtis' Reports. That was a libel for the repair of an old vessel, known to be owned by parties other than the contractors, for repairing. I have, therefore, no occasion to consider whether a double lien might be sustained under the statute.

The third ground of defence is, that there was a waiver of the lien, and the fact relied upon is, that the materials were charged to Manson & Fernald. This is evidence. but not conclusive evidence, of an intention not to rely upon the vessel. It may be explained and repelled, and I think is so here. This debt was contracted before the vessel had any name. The charge was made as a mere memorandum, and not from an intention to rely upon the builders alone. The agreed statement of facts declares that the libellants believed they had a lien. This is inconsistent with an intention, or agreement, to waive the lien. It is equivalent to saying that they intended to rely upon it. Decree for the libellants.

[On appeal to the circuit court, this decree was reversed. Case No. 12,282.]